IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JOE HAND PROMOTIONS, INC., | ) | CASE NO. 5:15CV478 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | KATHLEEN B. BURKE |
| | ) | |
| JEFFREY M. PICKETT, et al., | ) | |
| | ) | |
| Defendants. | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |

Plaintiff Joe Hand Promotions, Inc. ("Joe Hand") alleges in its Complaint that Defendants Jeffrey Pickett and Tiger Paw, LLC, both individually and as the alter ego of Barley House, intercepted and exhibited a telecast mixed martial arts fight, the Ultimate Fighting Championship 158 (the "Program"), at the Barley House bar/restaurant in Akron, Ohio ("Barley House"), on March 16, 2013, in violation of 47 U.S.C. § 605 (the Communications Act of 1934) (Count I) and 47 U.S.C. § 553 (the Cable & Television Consumer Protection and Competition Act of 1992) (Count II).[1]  Doc. 1.

Liability is not disputed.  The parties have agreed that the "unlicensed showing of the Program in the Barley House on March 16, 2013 constituted a violation of Title 47 U.S.C. Section 605 on the part of Defendants Jeffrey M. Pickett and Tiger Paw LLC."  Doc. 32. However, the issue of damages under 47 U.S.C. § 605 is contested and has been fully briefed by the parties. Docs. 37, 39, 41.  Joe Hand seeks $10,000.00 in statutory and $40,000.00 in enhanced damages, plus $7,300.00 in attorneys' fees and $400.00 in costs.  Doc. 37, p. 18. Defendants assert that damages should be limited to $3,200.00.  Doc. 39.  For the reasons

---

[1] Count II has been dismissed.  Doc. 35.  Joe Hand's complaint also contained a state law claim for conversion (Count III).  Doc. 1.  Joe Hand has also dismissed count III.  Doc. 35.

1

explained below, Plaintiff Joe Hand Promotions, Inc. is awarded statutory damages of $3,750.00; enhanced damages of $7,500.00; $7,300.00 in attorneys' fees and $400.00 in costs, for a total award of $18,950.00.

## I. Factual Background

Joe Hand is a closed-circuit distributor of sports and entertainment programming. Doc. 26, p. 1, ¶ 4. Joe Hand purchased the commercial exhibition licensing rights to the Ultimate Fighting Championship 158 Fight Program ("Program"), which was broadcast on March 16, 2013. Doc. 26, p. 1, ¶ 4. After purchasing these rights, Joe Hand promoted the sublicensing of these rights to its commercial customers. Doc. 26, p. 1, ¶ 5.

Jeffrey Pickett is the principal owner, managing member, and operator of Tiger Paw LLC. Doc. 26, p. 1, ¶ 2-3. He receives financial benefit from the operation of Tiger Paw LLC, and he is the individual identified on the Liquor License for the bar and restaurant called Barley House that is located in Akron, Ohio. Doc. 26, p. 1, ¶ 2. Joe Hand did not license the Program to Barley House, Tiger Paw LLC, Jeffrey Pickett, or anyone acting on their behalf for use within Barley House on March 16, 2013. Doc. 26, p. 2, ¶ 9.

On March 16, 2013, at 10:33 pm, a private investigator hired by Joe Hand, Yvonne Lewis-Wilson of Taylor and Associates, entered Barley House at 222 S. Main Street #1B in Akron, Ohio and observed 27 televisions with the Program being displayed on numerous screens.[2] Doc. 37-2, p. 1; Doc. 26, p. 2, ¶ 8. Four televisions were displaying Keno. Doc. 37-2, p. 1. Ms. Lewis-Wilson did not pay a cover charge to enter. Doc. 37-2, p. 1. During her visit, the investigator did not see any advertisements for the Program within the establishment. Doc. 37-2, p. 1. She was able to see a large portion of the Program and was able to identify several

---

[2] Plaintiff's brief and affidavits provide differing numbers of televisions that were displaying the Program. Doc. 37, p. 5 (Plaintiff's brief – 15 televisions); Doc. 37-1, p. 5, ¶18 (Affidavit of Joe Hand's President – 16 televisions); Doc. 37-2, p. 1 (Investigator's affidavit – 21 televisions).

undercard fighters, as well as advertisements that were displayed during the fight.  Doc. 37-2, p. 1.  She estimated that the capacity of the establishment was approximately 800 people.  Doc. 37-2, p. 2.[3]  She took three separate counts of persons present: 733, 760, and 802.  Doc. 37-2, p. 2.  The investigator left Barley House at 11:53 pm.  Doc. 37-2, p. 2.

Pickett indicated that he was unaware of any social media communications from Barley House with respect to the Program.  Doc. 40, p. 2, ¶ 7.  There was no advertising regarding the Program at Barley House and the Barley House online calendar did not include the Program.  Doc. 37-2, p. 1;  Doc. 40, p. 2, ¶ 7.  Pickett contends that, until he received a communication from Joe Hand's counsel in April, 2013, he had no knowledge that the Program was shown.  Doc. 40, p. 2, ¶ 6.  Upon learning that the Program was displayed on March 16, 2013, Pickett warned and counseled Barley House's employees and manager regarding their actions and the consequences of their actions.  Doc. 40, p. 2, ¶ 6.

## II.  Law and Analysis

"A plaintiff cannot recover damages under both 47 U.S.C. §§ 553 and 605."  *Joe Hand Promotions, Inc. v. Orim, Inc.*, No. 1:10-cv-00743, 2010 WL 3931108, at *2 (N.D. Ohio Oct. 5, 2010) ("Courts typically permit a claimant to recover under only one section.").

Defendants have stipulated to liability for a violation of 47 U.S.C. § 605 and Joe Hand has dismissed its claim under 47 U.S.C. § 553.  Doc. 39, p. 1.  However, Defendants dispute the amount of damages to be awarded under § 605 and the parties have submitted briefs on the issue for this Court's consideration.

---

[3] The capacity estimated by the investigator differs from the occupancy number on Barley House's Certificate of Occupancy issued by the City of Akron's Department of Buildings.  Doc. 40, p. 2, ¶ 5, As set forth below, the Certificate of Occupancy states an occupancy load of 475.  Doc. 40, p. 2, ¶ 5.

**Damages Under 47 U.S.C. § 605**

    **A.  Statutory Damages**

Under 47 U.S.C. § 605, a plaintiff may elect to recover either the amount of damages it actually suffered, or damages falling under a range provided by the statute, but not both.  *Orim*, 2010 WL 3931108, at *2.  Joe Hand has elected to recover statutory damages instead of actual damages.  Doc. 37, pp. 4-10.

Under 47 U.S.C. § 605(e)(3)(C)(i)(II), a plaintiff "may recover an award of statutory damages for each violation … in a sum of not less than $1,000 or more than $10,000, as the court considers just."  "The amount of damages assessed pursuant to § 605 rests within the sound discretion of the court."  *Buckeye Cablevision, Inc. v. Sledge,* No. 3:03CV7561, 2004 WL 952875, at *4 (N.D.Ohio April 8, 2004).  Joe Hand has requested full statutory damages of $10,000.00.  Doc. 37, p. 6.

In determining the amount of statutory damages, courts have considered the applicable licensing fee for the venue and the plaintiff's cost to monitor and investigate its broadcasting rights.  *National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 918 (6th Cir. 2001); *Joe Hand Promotions, Inc. v. Potopsky*, No. 1:10-cv-1474, 2011 WL 2648610, at *4 (N.D. Ohio Jul. 6, 2011).  The applicable licensing fee is measured by what the defendant "would have had to pay" to obtain a license.  *Potopsky*, 2011 WL 2648610, at *4 ("[C]ourts may consider the price a defendant would have had to pay to obtain the right to receive and display a broadcast[.]"); *Joe Hand Promotions, Inc. v. McBroom*, No. 5:09-cv-276(CAR), 2009 WL 5031580, at *4 (M.D.Ga. Dec. 15, 2009) ("This court … will award statutory damages in an amount equal to the license fee Defendants would have paid if [they] had legally purchased the right to exhibit the

4

Program."); *J & J Sports Prods., Inc. v. Arboleda*, No. 6:09-CV-467-Orl-18DAB, 2009 WL 3490859, at *6 (M.D.Fla. Oct. 27, 2009) ("Judge Moody considered evidence of the fee that would have been charged to the bar for the legal transmission of the boxing event.") (discussing *Kingvision Pay-Per-View, LTD. v. Lardo*, No. 10-CV-0059, 2010 WL 3463316 (W.D.Pa. Nov. 25, 2015)).

This case presents an unusual fact situation in that it is undisputed that Defendants had previously sublicensed programs from Joe Hand and that the price Defendants had previously paid was less than the price they should have paid based on Joe Hand's rate card and the official occupancy of Barley House stated on its city-issued occupancy permit. As a result of these unusual facts, the parties dispute whether the price Defendants "would have had to pay" to license the Program on March 16, 2013, is the price they had actually paid previously, which was an erroneous price, or the price they should have paid based on the rate card and Barley House's official occupancy.

Before March 2013, Tiger Paw had previously sublicensed at least 28 UFC programs from Joe Hand. Doc 40, p. 2, ¶ 3.[4] Defendants had paid a price of $1,550 per event until May 2011, when they began paying $1,600 per event. Doc. 40, p. 2, ¶ 3. Barley House's August 9, 2006, Certificate of Occupancy from the City of Akron Department of Building Inspection states an occupancy load of 475. Doc. 40, p. 2, ¶ 5. According to Joe Hand's rate card, the price Barley House had been paying, $1,600.00 per program, was the price associated with an occupancy of 176-200. Doc. 37-1, p. 8. Also according to Joe Hand's rate card, the price an establishment with an occupancy of 475 should have paid was $3,750. Doc. 37-1. Thus, Joe

---

[4] Defendant Tiger Paw has owned Barley House since February 8, 2008. Doc. 40, p. 1, ¶ 1. Before that, Barley House was owned and operated by a company unrelated to Defendants. Doc. 40, p. 1, ¶ 1. According to Pickett, that prior ownership had also ordered UFC fights. Doc. 40, p. 1, ¶ 2.

5

Hand points out that the rates Defendants actually paid previously were significantly below what they should have been.  Doc. 37, pp. 6-7.

Joe Hand argues that what Defendants actually paid in the past is irrelevant and that the licensing fee that Defendants "would have had to pay" on March 16, 2013, is $3,750.00.[5]  Doc. 37, p. 6-7.  Without disputing that the price they previously paid was erroneous, Defendants argue that, had they purchased the Program, they "would have paid" $1,600.00 as they had in the past, and that should be deemed the applicable licensing fee in determining the amount of statutory damages.  Doc. 39, p. 4-7.  Many courts have addressed the issue of statutory damages, but neither party has provided legal authority addressing this exact fact scenario.

The Court agrees with Joe Hand that what Defendants had paid in the past is not the relevant inquiry, particularly where the facts as to the applicable fee for an establishment with Barley House's occupancy to license the Program on March 16, 2013, are undisputed.[6]  Defendants do not dispute that the occupancy of Barley House is 475 or that the prices on the rate card are correct for the Program on March 16, 2013, such that the licensing fee should have been $3,750.00.

As stated above, in determining statutory damages, this Court may consider and may award "an amount equal to the license fee Defendants would have paid if [they] had legally purchased the right to exhibit the Program." *Joe Hand Promotions, Inc. v. McBroom*, No. 5:09-cv-276(CAR), 2009 WL 5031580, at *4 (M.D.Ga. Dec. 15, 2009).  Defendants' argument requires the Court to assume that Defendants would have paid an incorrect price of $1,600.00 for the Program simply because they had paid that incorrect price in the past for other programs.

---

[5] Joe Hand is not seeking to recover for the alleged previous underpayments by Defendants.  Doc. 37, p. 7.

[6] Neither party has provided any evidence that would shed light on the reason Defendants had been paying an incorrect price.

6

This Court will not speculate or assume that Defendants would have paid a concededly incorrect amount for the Program on March 16, 2013, had they legally purchased it.  Rather, the Court finds that, based on the rate card provided by Joe Hand, an establishment with a capacity of 475 would have paid $3,750 for the Program.  Doc. 37-1.  *See e.g., J & J Sports Prods., Inc., v. Zambrano*, No. 4:14-cv-960, 2015 WL 3682588, at *5 (N.D. Ohio June 12, 2015) (calculating statutory damages based on the maximum capacity of the restaurant, as provided on the rate card);  *McBroom*, 2009 WL 5031580, at *6 (same);  *Arboleda*, 2009 WL 3490859, at *7 (same).  Joe Hand has not provided evidence regarding the costs it incurred in investigating Barley House's showing of the Program on March 16, 2013.  Accordingly, the Court awards Joe Hand statutory damages in the amount of $3,750.00.

### B.  Enhanced Damages

Joe Hand also seeks enhanced damages for Defendants' violations of 47 U.S.C. § 605.  Under § 605(e)(3)(C)(ii), enhanced damages are appropriate when "the court finds that the violation was committed willfully and for purposes of direct or indirect commercial advantage or private financial gain."  Section 605(e)(3)(C)(ii) further provides that it is within a court's discretion to "increase the award of damages … by an amount of not more than $100,000 for each violation."

Many courts have found that, because intercepting and unscrambling a television signal requires an overt act by the violator, the conduct is per se willful.  *McBroom*, 2009 WL 5031580, at *5 ("Courts have found that willfulness under section 605 is 'established by the fact that an event is broadcast without authorization.'"); *see also Joe Hand Promotions, Inc. v. Leon*, No. 1:06-CV-1180-JOF, 2007 WL 4097412, at *2 (N.D.Ga. Oct. 31, 2007); *J & J Sports Prods., Inc. v. Kosoria*, No. 06-CV-2102 KMK, 2007 WL 1599168, at *3 (S.D.N.Y. June 1, 2007).

In the present action, the Court finds that Defendants' conduct was willful. In his affidavit, the president of Plaintiff, Joe Hand Promotions, Inc., Joe Hand Jr., described five methods used to pirate programming. Doc. 37-1, p. 3. Four of these five methods involve the purchase, installation, or use of outside equipment in order to intercept a signal, indicating that an overt act must be taken by the violator. Doc. 37-1, p. 3. The fifth method involves a violator misrepresenting his commercial establishment as a residence in order to obtain a lower fee rate. Doc. 37-1, p. 3. Based on the evidence in the present action, the fifth method can be ruled out conclusively, leading the Court to the conclusion that Defendants' method of intercepting the Program was likely one of the four that involved purchase, installation, or use of outside equipment. Performance of one of these overt acts is sufficient to establish that the conduct here was willful. *See e.g.*, *RPM Management*, 2011 WL 5389425, at *3. Pickett appears to challenge the willfulness of Defendants' conduct by denying that he had prior knowledge that the Program was being shown. Doc. 40, p. 2, ¶ 6. While Pickett may not have had personal knowledge, persons employed by Tiger Paw, LLC did have knowledge and Pickett is the principal owner, managing member, and operator of Tiger Paw, which operates Barley House as its primary business. Doc. 26, p. 1, ¶ 2-3. Further, Defendants acknowledge that they have purchased similar programs from Joe Hand on at least 28 previous occasions, meaning that they were aware of the procedures necessary to sub-license and display the Program in Barley House. Doc. 37-1, p. 5, ¶ 19; Doc. 40, p. 2, ¶ 3. Thus, Pickett's denial of personal knowledge, without more, is insufficient to overcome a finding of willfulness.

In determining whether the violation was done for purposes of direct or indirect commercial advantage or private financial gain, factors to consider include the presence of a cover charge, increased food and drink prices, advertising for the Program, and occupancy

8

relative to maximum capacity of establishments.  *Potopsky*, 2011 WL 2648610, at *5.  However, the absence of these factors is not determinative of whether enhanced damages are appropriate when other factors are present.  *See Zambrano*, 2015 WL 3682588, at * 5 (citing *Joe Hand Promotions, Inc. v. RPM Management Co. LLC*, No. 2:11-CV-377, 2011 WL 5389425, at *4 (S.D.Ohio Nov. 7, 2011) (considering the number of televisions displaying a fight, as well as previous violations and the nature of the establishment as a sports bar when determining whether infringement is willful)).

In this case, there is no evidence of a cover charge or increased food and drink prices.  Doc. 37-2, p. 1; Doc. 40, p. 3, ¶ 8.  Also, there is no evidence of advertising.  For example, Joe Hand's investigator noticed no advertisements for the Program within Barley House.  Doc. 37-2, p. 1.  Additionally, Pickett stated in his affidavit that Barley House's online calendar of events did not include the Program.  Doc. 40, p. 2, ¶ 7.  Joe Hand alleges in its brief that Defendants advertised the showing of the Program on social media (Doc. 37, pp. 8, 14) and Joe Hand Jr. states in his affidavit that the investigator produced "screen shots" showing that the Program was being advertised on social media (Doc. 37-1, p. 5, ¶ 15).  However, the investigator's affidavit does not address social media postings.[7]  Notwithstanding the absence of a cover charge or evidence of advertising, on the evening that the Program was shown, all parties agree that Barley House was full.  For example, Joe Hand alleges in its brief that there were 400 or more people present (Doc. 37, p. 15); Joe Hand's investigator estimated between 700 and 800 (Doc. 37-2, p. 2); and Pickett estimated that there were between 300 and 350, although he was not present that night (Doc. 40, p. 2, ¶ 4).  Additionally, the Program was being displayed on multiple televisions throughout the bar.  Doc. 37-2, p. 2.  Further, while Defendants assert that there was "no

---

[7]Pickett, in his affidavit, indicates that he was "unaware that there was any social media communications from Barley House with respect to the Event."  Doc. 40, p. 2.

9

significant increase in Barley House's business the evening of the Event" and contend that any increase in sales could be attributed to St. Patrick's Day weekend and the MAC Championship men's basketball game (Doc. 40, p. 4, ¶ 9; Doc. 39, p. 3), Defendants present no specific evidence comparing their sales on this particular St. Patrick's Day weekend with any other, and there is no evidence showing that any of the televisions in Barley House were playing the MAC Championship game at the time the Program was being shown. Based on the foregoing, the Court finds that there is a sufficient basis to conclude that the violation was for purposes of direct or indirect commercial advantage or private financial gain resulting from the violation.

When assessing enhanced damages, courts also consider the need to deter future violations. *McBroom*, 2009 WL 5031580, at *5. If a defendant is merely ordered to pay what it would originally have paid for a program, there may be little incentive for the defendant to avoid future pirating: it may choose to gamble on not getting caught the next time. *See J&J Sports Prod. V. Palumbo*, 2012 WL 6861507, * 3 (N.D. Ohio Dec. 12, 2012), *report and recommendation adopted*, 2013 WL 162489 (N.D. Ohio Jan. 15, 2013) ("Merely requiring Defendants to pay the price they originally would have been charged to obtain legal authorization to display the Program does nothing to accomplish" the objective of deterring future violations.).

Also, in addition to the factors outlined above, when considering enhanced damages, courts look at whether Defendants are repeat violators. *Kingvision*, 2010 WL 3463316, at *4 (finding that a lack of evidence of defendants repeatedly pirating events over time served as a mitigating factor in damages). Here, there is no evidence that Defendants are repeat offenders and Pickett asserts in his affidavit that there have been no incidents or allegations of other violations. Doc. 40, p. 4, § 11.

In summary, the evidence shows that Defendants are first time violators and they did not charge a cover or advertise. However, the restaurant was full and may have experienced some increased business from the display of the Program. Also, the Program was being displayed on multiple televisions throughout the establishment that night. Additionally, Defendants were aware of what they needed to do to sub-license programs since they had done so many times in the past. Doc. 37-1, pp. 5-6, ¶ 19; Doc. 40, p. 3, ¶ 3.

Based on the foregoing, the Court finds that Defendants conduct was willful and that enhanced damages are warranted. However, the Court finds that Defendants' conduct was not so egregious as to warrant an award of $40,000.00 as sought by Joe Hand, which amounts to more than 10 times the amount of the licensing fee for the Program. The Court finds that enhanced damages in the amount of $7,500.00, which is double the amount of statutory damages, is appropriate under the circumstances.

### C. Costs and Attorneys' Fees

Joe Hand has requested costs and attorneys' fees under 47 U.S.C. § 605(e)(3)(B)(iii). Section 605 provides that a court "shall direct the recovery of full costs, including awarding reasonable attorneys' fees to an aggrieved party who prevails." Joe Hand has submitted an affidavit detailing its attorneys' fees in the amount of $7,300.00 and costs in the amount of $400.00 for the filing fee. Doc. 42. Defendants do not contest these amounts and the Court finds the amount of costs and fees requested reasonable. Accordingly, the Court awards Joe Hand costs and attorneys' fees in the amount of $7,700.00.

## III. Conclusion

For the foregoing reasons, the Court awards Joe Hand damages on its claim under 47 U.S.C. § 605, consisting of statutory damages of $3,750.00 plus enhanced damages of $7,500.00, and $7,700.00 in fees and costs, for a total award of $18,950.00.

IT IS SO ORDERED.

Dated: July 11, 2016

Kathleen B. Burke
United States Magistrate Judge